UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- X
                                :

BANK OF BARODA, NEW YORK BRANCH,  :
                                :

                 Plaintiff,    :

        -against-           :

HARSH IMPORTS, INC., *et al.*,       :
                                :

             Defendants.  :
--------------------------------------------------------------- X

1:22-cv-2257-GHW

MEMORANDUM OPINION &
ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  3/22/2023

GREGORY H. WOODS, United States District Judge:

I.    **INTRODUCTION**

      For over thirty years, Plaintiff Bank of Baroda and Defendants here—Harsh Imports, Inc., a small business selling Indian handicrafts, and Harssh Madhok, that business's owner—worked together in what was, by all accounts, a fruitful relationship.  But in recent years, that relationship began to break down—driven in part by Harsh Imports' failure to pay interest on its debt. Eventually, Plaintiff moved to collect what it alleged Defendants owed; when Defendants refused to pay, Plaintiff initiated this lawsuit.

      While Plaintiff raises numerous bases on which it believes Defendants breached the parties' agreements, each of which it alleges is sufficient to sustain this action, the Court need only reach the issue of Harsh Imports' failure to pay interest due each month (and Madhok's failure to subsequently cover that payment).  Because the evidence shows that on several occasions, Defendants indeed failed to pay interest on their account in accordance with the terms of the parties' agreements, and because those agreements indisputably gave Plaintiff the right to accelerate the loans and collect any amounts due in full after a payment default, Plaintiff's motion for summary judgment is GRANTED.

## II.    BACKGROUND

### A.  Facts[1]

Plaintiff Bank of Baroda, New York Branch ("Plaintiff," or the "Bank") has an over thirty-year relationship with Defendants Harsh Imports, Inc. (the "Borrower") and Harssh Madhok (the "Guarantor").  Dkt. No. 34 ("Madhok Decl.") ¶¶ 1–2.  On December 2, 2016, the parties entered into three agreements (together, the "Agreements").  First, the parties signed an Amended and Restated Credit Agreement (the "Credit Agreement").  Dkt. No. 28 ("Patra Decl.") Ex. A (the Credit Agreement); *see* Dkt. No. 38 ("Pl's 56.1 Reply") ¶ 1.  In conjunction with the Credit Agreement, the Bank and the Borrower also entered into an Amended and Restated Revolving Promissory Note (the "Revolving Loan Note").  Patra Decl. Ex. B.  And the Bank and the Guarantor also executed an Amended and Restated Guaranty the same day (the "Guaranty").  Patra Decl. Ex. G.  The Agreements are governed by New York law.  Credit Agreement § 10.08 ("This Agreement, the Notes, the other Credit Documents, and all other documents provided for herein . . . shall be governed by and construed and enforced in accordance with the internal laws . . . of the State of New York.").

Under the Credit Agreement, the Bank agreed to extend a revolving credit facility to the Borrower in an amount not to exceed $550,000.  *See* Revolving Loan Note at 1.  There is no dispute that, after the execution of the Credit Agreement and Revolving Loan Note, the Bank indeed extended the revolving credit facility to the Borrower and made the full $550,000 commitment available to it.  Nor is there any dispute that Borrower borrowed and used the amounts extended to it by the Bank, together with accrued interest.  *See generally, e.g.*, Madhok Decl. Ex. 1 (the "Account

---

[1] The facts are taken from the parties' Local Rule 56.1 statements and other documents submitted in connection with the parties' briefing.  Unless otherwise stated, the facts are undisputed by the parties.  Any disputed facts are viewed "in the light most favorable to the part[ies] opposing summary judgment"—Defendants—while "drawing all reasonable inferences in [their] favor."  *M.A. ex rel. H.R. v. Rockland Cnty. Dep't of Health*, 53 F.4th 29, 35 (2d Cir. 2022) (quoting *Guan v. City of New York*, 37 F.4th 797, 804 (2d Cir. 2022)).

Statements") (showing that the Borrower's account balance with the Bank was near $550,000 during the time relevant to this litigation).

The Bank also agreed—upon the satisfaction of certain conditions precedent—to allow the Borrower to take out a Term Loan for a principal of $100,000, so long as the Borrower's aggregate advances from the Term Loan and its revolving loans did not exceed $650,000. *See* Credit Agreement §§ 2.01(a), 3.01–3.02.[2]

The Revolving Loan Note details the Borrower's promise to pay to the Bank overdraft amounts under the Credit Agreement up to $550,000 and to pay interest on that amount. *See* Revolving Loan Note at 1; *see also* Credit Agreement § 4.03 (also detailing payment due under the Revolving Loan Note and other agreements between the parties). Finally, under the Guaranty, the Guarantor "absolutely, unconditionally and irrevocably guarant[eed] the payment when due," including payment based on any acceleration, "of all obligations of the Borrower under the Credit Agreement, including without limitation . . . the Revolving Loan Note." Guaranty ¶ 1.

Both the Credit Agreement and the Revolving Loan Note detail the obligation of the Borrower and the Guarantor to pay interest on the Revolving Loan Note and other amounts owed to the Bank. The Credit Agreement states: "The Borrower shall make each payment of interest under this Agreement or under the Notes to the Bank at the Branch Office in Dollars in immediately available funds by no later than the close of business in New York City on the last day of each month." Credit Agreement § 4.03(b). The language in the Revolving Loan Note regarding the payment of interest differs slightly; instead of requiring interest payments on the last day of the month, it states that the Borrower must "pay interest . . . on the first day of the succeeding month."

---

[2] Guarantor has attested that despite his repeated demands, the Bank has refused to release the $100,000 Term Loan. See Madhok Decl. ¶¶ 35–38; *see also* Dkt. No. 36 ("Pl's Reply") at 7–8 (Plaintiff admitting that it has refused to release the Term Loan, but arguing it was justified in not doing so). This issue does not bear on Plaintiff's motion here.

3

Revolving Loan Note at 1.[3]  Either way, the Credit Agreement explains that if "[t]he Borrower or the Guarantor shall . . . fail to pay any installment pursuant to the terms of the Notes when due or any interest or premium thereon . . . within thirty (30) days of the due date," then:

> the Bank may . . . declare the Notes, all interest thereon, and all other amounts payable under this Agreement to be forthwith due and payable, whereupon the Notes, all such interest, and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest, or further presentment of any kind, all of which are hereby expressly waived by the Borrower and the Guarantor.

Credit Agreement § 9.01.[4]

Satya Patra, the Bank's Deputy General Manager, has attested—in line with the Revolving Loan Note's text—that "interest" for the previous month is "due on the next day of the succeeding month."  Dkt. No. 56-1 ¶ 4.  He has also stated that the Bank's practice is that "[w]hen a new payment comes in, charges and penalties are adjusted first, then currently outstanding interest, then principal." *Id.* ¶ 12.  So it is undisputed that when the Borrower made a deposit into the account, the Bank would apply that deposit—as relevant here—first to any outstanding interest payments, and then to the loan principal. *See id.* ¶¶ 8–10 (describing this practice for specific months); *see also* Credit Agreement § 4.08 ("All amounts received by the Bank from the Borrower relative to this Agreement and the Notes shall be applied . . . at the discretion of the Bank.").

The Bank ultimately took issue with Defendants' compliance with the Agreements' terms.  In August 2020, the Bank sent Defendants a letter reporting what they believed to be issues with Defendants' lack of payment and with the Defendants' alleged failure to provide

---

[3] Both documents also explain how interest is to be calculated. *See* Credit Agreement § 4.01; Revolving Loan Note at 1. No party takes issue with the Bank's calculation of interest.
[4] The Agreements contain many additional provisions, including those related to the Borrower's duty to comply with certain reporting requirements. *See, e.g.*, Credit Agreement § 7.09.  Because, as explained in Part IV of this opinion, the Court finds the Borrower's failure to pay interest in compliance with the Agreements' terms sufficient to resolve this case, it need not further detail the other provisions of the Agreements.

financial documents.  Patra Decl. Ex. H.  The Bank warned that if Defendants failed to

"address all the observations/irregularities pointed out" in the letter, it reserved the right to

"initiate recovery actions."  *Id.* at 6.  Defendants responded in October 2020 by providing

some financial statements, and in February 2021 by providing additional documentation and

an explanation of their financial situation.  Madhok Decl. Exs. 2–3.

But Defendants' alleged noncompliance continued.  Specifically, records show that

the Borrower did not add any funds to its account in the months of February 2021, May

2021, or June 2021, as no deposits by the Borrower are recorded in the "Credit Amount"

column of those records during those months.

| Sr. No | Date | Description(Remarks) | Cheque No. | Debit Amount | Credit Amount | Balance Amount |
|---|---|---|---|---|---|---|
| | | **Transactions Made -[Details till 03/19/2022 6:08 AM ]** | | | | |
| 1 | 01/22/2021 | **REVERSAL OF INT REVERSAL** | | 38,719.21 | | -588,684.31 |
| 2 | 01/22/2021 | ▮▮▮▮▮0006:Int.Coll:01-12-2020 to 31-12-2020<br>Interest run | | 4,765.90 | | -593,450.21 |
| 3 | 01/22/2021 | **FDR CLOSURE PROCEEDS FROM INDIA** | | | 50,000.00 | -543,450.21 |
| 4 | 01/29/2021 | **Account Mnt Charge**<br>ACMNT_01-01-2021_31-01-2021 | | 25.00 | | -543,475.21 |
| 5 | 01/29/2021 | ▮▮▮▮▮0006:Int.Coll:01-01-2021 to 31-01-2021<br>Interest run | | 3,717.58 | | -547,192.79 |
| 6 | 02/26/2021 | ▮▮▮▮▮0006:Int.Coll:02-01-2021 to 02-28-2021<br>Interest run | | 3,404.76 | | -550,597.55 |
| 7 | 03/15/2021 | **HARSH IMPORTS,INC**<br>HARSH IMPORTS,INC | | | 2,000.00 | -548,597.55 |

| | | | | | |
|---|---|---|---|---|---|
| 8 | 03/26/2021 | ACCOUNT MNT CHARGE<br>ACMNT_01-02-2021_28-02-2021 | | 25.00 | -548,622.55 |
| 9 | 03/31/2021 | ████0006 Int Coll 03 01 2021 to 03-31-2021<br>Interest run | | 3,813.51 | -552,436.06 |
| 10 | 04/06/2021 | HARSH IMPORTS INC<br>HARSH IMPORTS INC | | 3,000.00 | -549,436.06 |
| 11 | 04/27/2021 | HARSH IMPORTS INC<br>HARSH IMPORTS INC | | 5,000.00 | -544,436.06 |
| 12 | 04/30/2021 | HARSH IMPORTS,INC<br>HARSH IMPORTS,INC | | 5,000.00 | -539,436.06 |
| 13 | 04/30/2021 | ████0006:Int.Coll:04-01-2021 to 04-30-2021<br>Interest run | | 4,573.15 | -544,009.21 |
| 14 | 05/05/2021 | ACMNT CHRG 01 04 21 30 04 21<br>ACMNT_01-04-2021_30-04-2021 | | 25.00 | -544,034.21 |
| 15 | 05/14/2021 | INWARD CLEARING<br>Check No. 9078 | 9078 | 1,907.00 | -545,941.21 |
| 16 | 05/14/2021 | INWARD CLEARING<br>Check No. 9063 | 9063 | 481.00 | -546,422.21 |
| 17 | 05/28/2021 | ████0006:Int.Coll:05-01-2021 to 05-31-2021<br>Interest run | | 4,696.65 | -551,118.86 |
| 18 | 06/30/2021 | BY TRANSFER<br>INT REVERSAL | | 9,269.80 | -541,849.06 |
| 19 | 07/26/2021 | ELITE CREATION LLC<br>HARSH IMPORTS INC | | 4,000.00 | -537,849.06 |

Account Statements at 9–10.[5]  The Bank contends that, as the Borrower did not deposit any

money into the account during these months, the Borrower failed to make payments on

---

[5] While the parties dispute exactly what the $9,269.80 "Credit Amount" made on June 30, 2021 represents, *see* Account Statements at 10 Line 18, neither party alleges that it constituted a deposit by the Borrower.  *Compare* Defs' Sur-Reply at 4 (contending that this payment was made by the Bank to return "wrongfully charged interest"), *with* Pl's First Sur-Reply at 6 (stating that the payment was an implementation of the Bank's standard procedures when it declares an account to be a non-performing asset).

interest run for the preceding months—January 2021, April 2021, and May 2021, respectively—though it concedes that later payments in March and April 2021 covered the January 2021 charge.  *See* Dkt. No. 27 ("Pl's Mem.") at 5 (stating that Defendants failed to pay the April and May 2021 interest charges); *see also* Dkt. No. 56-1 ¶¶ 7–8 (the Bank noting that later payments in March and April 2021 covered January 2021 interest).

In July 2021, meanwhile, Patra advised Madhok that he had been given a "mandate" to move away from doing business with smaller borrowers like Harsh Imports, and that he had been instead directed to focus on other lines of business such as "Syndication loans" which the Bank believed were more profitable.  Dkt. No. 33 ("Defs' Opp'n") at 3; *see* Madhok Decl. ¶¶ 3–6.  The Bank does not dispute that this conversation occurred, but denies that Patra mentioned any mandate or connected the Bank's priorities to Defendants' accounts.  Dkt. No. 38 ¶¶ 38–40.

In any event, in a letter sent by the Bank to Defendants on August 24, 2021, the Bank notified Defendants that it believed that "Borrower is in default under the Credit Documents . . . by reason of its failure to make the requisite payments as set forth in the Credit Documents and Guarantor is in default under his Guaranty by reason of not paying the obligations of Borrower" under those documents.  Patra Decl. Ex. I at 2.  The Bank demanded payment of the full amount due under the Agreements, which it calculated at that time to be $553,949.22.  *Id.*  And it notified Defendants that if they failed to comply within fifteen days, the Bank would "accelerate [the Defendants'] debt and declare all amounts due under the Credit Documents and Guaranty to be immediately due and payable, without any demand, presentment or any further notice by the Bank."  *Id.* at 3.  After Defendants did not comply with that letter, the Bank sent subsequent letters on September 24, 2021 and December 3, 2021, which again informed Defendants of the full amount due (which had

reduced somewhat after the Bank applied all of the Borrower's collateral to the account), asked for full payment, and notified Defendants that if payment was not made, it would take steps to enforce the Agreements through the legal system. *Id.* at 4–6.

### B. Procedural History

On February 8, 2022, the Bank initiated suit in the Supreme Court of the State of New York, New York County, to recover what was allegedly owed by Defendants. Dkt. No. 2 Ex. 2. Defendants removed the case to this Court on March 18, 2022. Dkt. No. 2. On May 13, 2022, Plaintiff filed a motion for summary judgment and accompanying documents in support of that motion. Dkt. No. 26 (motion); Dkt. No. 27 (memorandum of law in support, or "Pl's Mem."); Dkt. Nos. 28–30 (supporting documents). Defendants opposed that motion on June 3, 2022. Dkt. No. 33 ("Defs' Opp'n"); Dkt. Nos. 34–35 (supporting documents). Plaintiff replied on June 17, 2022. Dkt. No. 36 ("Pl's Reply"). After receiving leave from the Court, Defendants filed a sur-reply on July 11, 2022. Dkt. No. 41 ("Defs' Sur-Reply"). Plaintiff then sought, and was granted, leave to file its own sur-reply in response. Dkt. No. 48 ("Pl's First Sur-Reply"). Defendants then filed, with leave of Court, an additional response to part of Plaintiff's Local Rule 56.1 statement, *see* Dkt. No. 54; in response, the Court permitted Plaintiff to file a second sur-reply to reply to Defendants' response, *see* Dkt. No. 56-1. As the Court wrote in a December 13, 2022 order, the Court has considered only the filings authorized by the Court, and any documents submitted in conjunction with those filings, in resolving Plaintiff's motion. *See* Dkt. No. 60.

### III. LEGAL STANDARD

When Plaintiff initiated this case in state court, it invoked New York procedural law to move for summary judgment in lieu of a complaint. *See* N.Y. C.P.L.R. § 3213 ("When an action is based upon an instrument for the payment of money only or upon any judgment, the plaintiff may serve with the summons a notice of motion for summary judgment and the supporting papers in lieu of a

complaint."); Dkt. No. 2 Ex. 2-I at 1 (requesting judgment pursuant to C.P.L.R. § 3213). Because "§ 3213 is a procedural rule," however, "when this case was removed to federal court, the regime of the Federal Rules replaced that of § 3213." *Com/Tech Comm'n Techs., Inc. v. Wireless Data Sys., Inc.*, 163 F.3d 149, 151 (2d Cir. 1998) (citing Fed. R. Civ. P. 81(c)). So here, unsurprisingly, Plaintiff's summary-judgment motion is governed by Federal Rule of Civil Procedure 56.[6]

Under Rule 56, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

To defeat a motion for summary judgment, the non-movant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted) (quoting former Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."

---

[6] Though the Court must apply federal rather than state procedural law, this case does not turn on that determination. In New York state court, under § 3213, "[t]o establish prima facie entitlement to judgment as a matter of law on the issue of liability with respect to a guaranty, a plaintiff must submit proof of the underlying note, a guaranty, and the failure of the defendant to make payment in accordance with the terms of those instruments." *Sterling Nat'l Bank v. Alan B. Brill, P.C.*, 129 N.Y.S.3d 151, 155 (2d Dep't 2020) (internal citation omitted). The plaintiff must also "demonstrate that there are no genuine disputes surrounding any of the facts that are material to these three requirements." *Torin Assocs., Inc. v. Perez*, No. 15-cv-8043, 2016 WL 6662271, at *4 (S.D.N.Y. Nov. 10, 2016) (citing *Inland Mortg. Cap. Corp. v. Realty Equities NM, LLC*, 900 N.Y.S.2d 79, 80 (2d Dep't 2010)). And if a plaintiff establishes that there are no disputed facts calling into question its *prima facie* entitlement, "the burden then shifts to the defendant to submit evidence establishing the existence of a triable issue with respect to a bona fide defense." *Jin Sheng He v. Sing Huei Chang*, 921 N.Y.S.2d 128, 130 (2d Dep't 2011). Though this scheme has more steps than Federal Rule 56's standard, it turns on the same question: whether there is a material disputed fact that precludes a finding of liability and damages. *See* Fed. R. Civ. P. 56(a). For the reasons explained below in Part IV, the Court finds that there are no such facts here; the result would be the same under New York's procedures.

*Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, and he or she "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (quotation omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quotation omitted).  The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002); *see also Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).  "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (quotation omitted).

Still, "[t]he possibility that a material issue of fact may exist does not suffice to defeat the motion; upon being confronted with a motion for summary judgment the party opposing it must set forth arguments or facts to indicate that a genuine issue—not merely one that is colorable—of material fact is present."  *Gibson v. Am. Broad. Cos.*, 892 F.2d 1128, 1132 (2d Cir. 1989).

## IV.   DISCUSSION

As the evidence shows that Defendants failed to timely pay interest several times in accordance with the terms of the Agreements, the Bank was entitled to accelerate and collect on Defendants' debt.  Additionally, even accepting that—as Defendants contend—the Bank exercised its contractual right to accelerate that debt based on a belief that doing so would allow it to pursue alternative business opportunities, that does not show that the Bank violated the implied covenant of good faith and fair dealing.  Accordingly, Plaintiff's motion for summary judgment will be granted.

**A. Acceleration Due to Defendants' Failure to Fulfill Obligations Under the Revolving Loan Note, Credit Agreement, and Guaranty**

Because the documents in connection with Plaintiff's motion establish that the Borrower failed to comply with the terms of the Revolving Loan Note and the Credit Agreement, the Bank was entitled to accelerate Defendants' debt.

Under the Credit Agreement, the Borrower is required to "pay interest to the Bank" based on an agreed-to calculation. Credit Agreement § 4.01. The documents at issue differ slightly as to when payment for each month's interest was due. The Credit Agreement states that interest for each month's payment is due "not later than the close of business in New York City on the last day of [that] month." *Id.* § 4.03(b). By contrast, the Revolving Loan Note states that the Borrower must "pay interest . . . on the first day of the succeeding month." Revolving Loan Note at 2. Either way, once the interest for the month's payment is tabulated, the Credit Agreement states that if "[t]he Borrower or the Guarantor . . . fail[s] to pay any installment pursuant to the Notes when due or any interest or premium thereon . . . within thirty (30) days of the due date . . . the Bank may . . . declare the Notes, all interest thereon, and all other amounts payable under [the Credit] Agreement to be forthwith due and payable" without any additional demands. *Id.* § 9.01. Through the Credit Agreement and the Guaranty, both the Borrower and the Guarantor are responsible for these amounts. *See id*; Guaranty at ¶ 1.

The Court assumes that the one-day-later payment date described by the Revolving Loan Note controls. *See* Dkt. No. 56-1 ¶ 4 (Patra attesting that the payment due date is the first day of the following month, in line with the Revolving Loan Note's text); *Johnson*, 680 F.3d at 236 (noting that the Court, on summary judgment, is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought"). Even so, the evidence shows that the Borrower failed to pay the April 2021 interest charge by May 31, 2021 (thirty days after May 1, 2021) and failed to pay the May 2021 interest charge by July 1, 2021 (thirty

11

days after June 1, 2021).  The Account Statements do not show any payments as having been made

by the Borrower in May or June 2021.

| | | Cheque No. | Debit Amount | Credit Amount | Balance Amount |
|---|---|---|---|---|---|
| 13 04/30/2021 | ████████0006:Int.Coll:04-01-2021 to 04-30-2021<br>Interest run | | 4,573.15 | | -544,009.21 |
| 14 05/05/2021 | ACMNT CHRG 01 04 21 30 04 21<br>ACMNT_01-04-2021_30-04-2021 | | 25.00 | | -544,034.21 |
| 15 05/14/2021 | INWARD CLEARING<br>Check No. 9078 | 9078 | 1,907.00 | | -545,941.21 |
| 16 05/14/2021 | INWARD CLEARING<br>Check No. 9063 | 9063 | 481.00 | | -546,422.21 |
| 17 05/28/2021 | ████████0006:Int.Coll:05-01-2021 to 05-31-2021<br>Interest run | | 4,696.65 | | -551,118.86 |
| 18 06/30/2021 | BY TRANSFER<br>INT REVERSAL | | | 9,269.80 | -541,849.06 |
| 19 07/26/2021 | ELITE CREATION LLC<br>HARSH IMPORTS INC | | | 4,000.00 | -537,849.06 |

Account Statements at 10 (modified to add headers in upper-right corner that appear earlier in the

document).[7]  From the face of that document, Defendants did not make any deposits into the

account within thirty days of the due date for the April and May 2021 interest charges—which

means that no interest was paid during that time and the Bank was entitled to accelerate Defendants'

debt.  *See* Credit Agreement § 9.01.

       Defendants, however, argue that this misreads the Account Statements.  Specifically, they

allege that what Plaintiff claims is interest *due* to be paid actually represents a *payment* of interest.  *See*

---

[7] As noted above, neither party contends that the $9,269.80 credit on June 30, 2021 applied to accrued interest amounts. *See supra* n.5.

Defs' Opp'n at 5–6.  The April 30, 2021 and May 28, 2021 entries on the Account Statements, Defendants note, are labeled "Int[erest] Coll[ected]," which they say indicates that these were payments, not amounts due.  *Id.*; *see* Account Statements at 10.

But Defendants' interpretation is incongruous with both common sense and the text of the Credit Agreement.  As can be seen in the Account Statements, when the April 30, 2021 and May 28, 2021 "Interest run[s]" occurred (as with all other entries in the "Debit Amount" column), the Borrower's overall balance amount *increased*.  *See* Account Statements at 10.  This simple fact makes it all-but-impossible to understand the interest run on the account as a *payment* by Defendants.  And most importantly, the text of the Credit Agreement precludes Defendants' preferred reading.  That Agreement requires that the Borrower "make each payment of interest under this Agreement or under the Notes to the Bank at the Branch Office *in Dollars*."  Credit Agreement § 4.03(b) (emphasis added).  Defendants do not claim that the line entries on April 30, 2021 and May 28, 2021 represent payments in dollars.  Indeed, as Plaintiff notes, when the Borrower did make a payment in dollars into the account, that amount was credited to the account, and the overall account balance reduced. *See, e.g.*, Account Statements at 10 Line 19.  But no such payments are shown on the Account Statements in May or June 2021, indicating that the interest charged from April and May 2021 was not paid during that time.[8]

Under the text of the parties' agreements, the failure to pay interest within thirty days of the due date triggered the Bank's right to "declare the Notes, all interest thereon, and all other amounts payable under [the Credit] Agreement to be forthwith due and payable, whereupon the Notes, all

---

[8] Defendants additionally argue that, as Plaintiff had not raised issues with previous failures to pay interest in accordance with Plaintiff's construction of the due date for interest payments, the "Bank has conceded to a practice of permitting late payments of interest for the last 30 years."  Defs' Sur-Reply at 3.  But under the text of the Credit Agreement, Plaintiff was entitled to enforce any failure to comply with the Agreements even if it had waived previous noncompliance.  Credit Agreement § 10.03 ("**No Waiver; remedies**.  No failure on the part of the Bank to exercise, and no delay in exercising, any right, power or remedy under any Credit Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right under the Credit Documents preclude any other or further exercise thereof or the exercise of any other right.").

such interest, and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest, or further notice of any kind."  Credit Agreement § 9.01.  The Bank informed Defendants that they were in default of the agreements on August 24, 2021—the Borrower for failing to make requisite payments as set forth in the Revolving Loan Note and Credit Agreement, and the Guarantor for failing to pay the obligations of the Borrower under those documents.  Patra Decl. Ex. I.  And they informed Defendants that, if the amount due was not paid within fifteen days, the Bank would accelerate the debt and make all of the amounts payable due immediately.  *Id.*  The Bank's letter, and its subsequent enforcement of the Agreements in this Court, follow from the plain text of the Credit Agreements and from the only reasonable interpretation of the evidence presented to the Court.[9]

### B.  Implied Covenant of Good Faith and Fair Dealing

Defendants argue that "even if the Bank had the contractual right to accelerate," in doing so, it breached the implied covenant of good faith and fair dealing.  Def's Opp'n at 16.  This argument is meritless.

"In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance."  *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002).  "This covenant embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'"  *Id.* (quoting *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995)).  The covenant, however, "do[es] not imply obligations 'inconsistent with other terms of the contractual relationship.'"  *Id.* (quoting *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 304 (1983)).  In other words, "the implied covenant of good

---

[9] Plaintiff raises a host of other arguments as to why it was permitted to accelerate payment under the agreements.  *See* Pl's Mem. at 4–7 (arguing that the Borrower breached the Credit Agreement by failing to provide timely financial documentation and by failing to replenish cash collateral security).  Because the Court finds that the Bank was entitled to accelerate payment because of the Borrower's failure to pay interest in April and May 2021, it need not reach these alternate grounds for acceleration.

faith and fair dealing 'cannot be construed so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights.'" *Gottwald v. Sebert*, 148 N.Y.S.3d 37, 47 (1st Dep't 2021) (quoting *Fesseha v. TD Waterhouse Inv. Servs.*, 761 N.Y.S.2d 22, 23 (1st Dep't 2003)).

Defendants' implied covenant argument is premised on a conversation that occurred in July 2021. They state that in that conversation, which occurred a month prior to the Bank's acceleration of Defendants' debt, Patra told Madhok that the Bank had been "directed" by upper management to "focus on [ ] other line[s] of business" that were more profitable for the Bank than were smaller loans like Defendants'. Defs' Opp'n at 16; *see* Madhok Decl. ¶¶ 3–6.[10] Defendants allege that this constitutes a "bad faith purpose" sufficient to breach the implied covenant. Defs' Opp'n at 16.

But the Bank is entitled to exercise its contractual rights in accordance with its commercial preferences, so long as it does so within the terms of the agreements. In *Transit Funding Associates, LLC v. Capital One Equipment Finance Corp.*, 149 A.D.3d 23 (1st Dep't 2017), for instance, New York's First Department Appellate Division held that in the absence of an express "good faith" provision in the parties' contract, a lender's decision to reject future funding requests "for its own business reasons" and in accordance with the terms of the parties' contract could not violate the implied covenant of good faith and fair dealing—even where it knew that its decision to do so would put the borrower out of business. 149 A.D.3d at 25, 29–30. As that court put it: "Because [the lender's] complained-of conduct consists entirely of acts it was authorized to do by the contract, its alleged motivation for doing so is irrelevant. Simply put, an intent to put [the borrower] out of business cannot justify a lawsuit for a claimed breach of the covenant where the express provisions of the agreement allowed [the first party] to act as it did." *Id.* at 29–30.

---

[10] Though Patra disputes some aspects of this conversation, he does not dispute that it occurred. *See* Dkt. No. 38 ¶¶ 38–40. In any event, the Court credits Defendants' account of the call based on its duty "to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quotation omitted).

Here, as described above, the Bank acted in accordance with the Agreements by moving to accelerate Defendants' debt, and collect money it had loaned to the Borrower, after the Borrower failed to pay several months of interest and the Guarantor failed to meet its obligation to cover those missed payments. *See supra* Part IV(A). Even accepting Defendants' allegations about the July 2021 conversation with Patra as true, the substance of that conversation merely reveals that the Bank wished to commercially focus on other loans. It does not show that the Bank exceeded its rights under contract, which in the typical case is necessary to demonstrate a violation of the implied covenant of good faith and fair dealing. *See Transit Funding*, 149 A.D.3d at 29–30; *see also Gottwald*, 148 N.Y.S.3d at 47 ("[T]he implied covenant of good faith and fair dealing cannot be construed so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights." (internal quotation marks and citation omitted)).

Defendants respond by pointing to authority indicating that even the exercise of a contractual right can violate the implied covenant when a party exercises that right "malevolently" and "for its own gain as part of a purposeful scheme designed to deprive [the other parties] of the benefits" of the contract. *Richbell Info. Servs. v. Jupiter Partners*, 309 A.D.2d 288, 302 (1st Dep't 2003). But the Bank's conduct here was not malevolent and did not deprive Defendants of the benefits of the Agreements. It is undisputed that the Bank lent the Borrower money, and that the Borrower had the use of those funds. The Agreements contained clear constraints on the Borrower's expectations regarding the funds lent to it by the Bank—most importantly, that the Borrower pay the loans when due. As described above, the Borrower failed to pay the loans. The Borrower cannot reasonably argue that requiring that it pay its loan somehow deprived it of the benefit of its bargain with the Bank. It was a loan, not an equity investment. Accepting that, as Defendants contend, the Bank exercised its rights under the agreement because it wished to reinvest the money in another, more profitable loan, the Bank's conduct was not malevolent.

It is important to emphasize that accepting the Borrower's argument would have profound consequences beyond the confines of this one case.  Defendants urge this Court to hold that a lender may not seek the return of money it lent to a borrower—even if that borrower fails to pay the loan—if the lender is motivated by a desire to reinvest that money in a more profitable investment.  *See* Defs' Opp'n at 16 (accusing the Bank of accelerating Plaintiff's loan because it wanted to "shift its time, energy, and resources to larger syndicated loans").  Accepting Defendants' argument would have a materially adverse impact on other small businesses in New York, and the many parties around the world who choose New York law to govern their loan agreements.  It is fair to assume that lenders want to reinvest the proceeds of their loans in a way that will make them money.  So to hold, as Defendants request, that a lender cannot seek repayment of a loan in accordance with its terms if the lender is motivated by a desire to reinvest the proceeds in a profitable investment, would impact many more transactions than the one at issue in this case.  Adopting Defendants' argument as a rule would disincentivize lending in New York.  After all, if lenders thought that it would be illegal for them to seek the repayment of a loan if they wished to reinvest that money is another, more profitable manner, as Defendants ask the Court to hold here, the risk of lending would increase substantially, and increased risk for lenders would translate to increased costs for borrowers. This Court declines to adopt Defendants' argument that a lender violates the implied covenant of good faith and fair dealing when the lender seeks repayment of a loan in accordance with the terms of its loan agreement because the lender wishes to use the proceeds to reinvest in more profitable loans.

*Richbell* is not to the contrary.  There, the court found that where an investment firm told the operator of a company—before the firm and company executed an agreement—that the firm would only exercise a veto right in the agreement defensively and for its own protection, but at all times before and after the agreement's consummation secretly planned with other stakeholders to use that

veto right to block the company's plan to IPO, that course of conduct violated the implied covenant of good faith even though the veto right was exercised in accordance with the agreement's terms. *Id.* at 290–95, 302–303.  Here, however, there is no allegation that the Bank made any misrepresentations to the Borrower or the Guarantor that improperly induced them to enter the agreements at issue in this case, or that the Bank had any secret, harmful plan when it executed those agreements.  Instead, Defendants merely take issue with the Bank's decision, after the Borrower failed to repay the loan, to exercise its negotiated, contractual right to accelerate the Borrower's loan and to enforce the Guaranty.  That decision does not violate the implied covenant of good faith and fair dealing.

### V. CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is GRANTED.  In its motion, Plaintiff requests relief in the amount of $556,933.18—the amount of accrued principal and interest as of April 30, 2022—as well as "interest, late charges, attorneys' fees, and [ ] costs and disbursements."  Pl's Mem. at 9; *see also* Credit Agreement § 10.05 (requiring the Borrower to pay "all costs and expenses . . . including . . . the reasonable fees and out-of-pocket expenses of counsel for the Bank . . . in connection with the enforcement of any of the Credit Documents.").  In order for the Court to calculate the full amount Plaintiff is entitled to and to enter judgment in this case, Plaintiff is directed to submit, by no later than two weeks following the date of this order, briefing and supporting documentation with respect to all forms of their requested relief.  The Court requests that Plaintiff include among the supporting documentation an Excel spreadsheet calculating the amounts that it claims to be due.  That spreadsheet should be both (a) filed on the docket under the cover of affidavit together with Plaintiff's other supplemental submissions and (b) submitted via email to the Court in native (Excel) format at WoodsNYSDChambers@nysd.uscourts.gov.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 26.

SO ORDERED.

Dated:  March 22, 2023
New York, New York

GREGORY H. WOODS
United States District Judge